**IN THE COURT OF APPEALS OF IOWA**

No. 22-1458
Filed December 7, 2022

**IN THE INTEREST OF E.C.,**
**Minor Child,**

**L.T., Mother,**
    Appellant,

**G.C., Father,**
    Appellant.
_____

Appeal from the Iowa District Court for Muscatine County, Gary P. Strausser, District Associate Judge.

Parents separately appeal the termination of their parental rights. **AFFIRMED ON BOTH APPEALS.**

Esther J. Dean, Muscatine, for appellant mother.

Christopher J. Foster of Foster Law Office, Iowa City, for appellant father.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena and Mackenzie Moran, Assistant Attorneys General, for appellee State.

Jean Pfeiffer of Muscatine Legal Services, Muscatine, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Greer and Badding, JJ.

**BADDING, Judge.**

The child who is the subject of these termination appeals—E.C., born in October 2020—has an older brother who suffered non-accidental brain injuries twice while in the care of the mother. Because the juvenile court considered the mother to be dangerous, E.C. was removed from her care the day after she was born. After more than a year of services, a termination hearing was held, following which the juvenile court entered a ruling terminating both parents' rights. E.C.'s mother and father separately appeal, challenging the sufficiency of the evidence supporting the grounds for termination and arguing they should be given more time to work toward reunification. We affirm.

## I.      Background Facts and Proceedings

E.C.'s older brother, J.T.,[1] was born in June 2019. The next month, the mother took J.T. to the hospital when she noticed that he was having seizures while they were at a friend's house. After admission to the hospital, J.T. was found to have subdural and retinal hemorrhages. Medical staff said the child's injuries could only be from someone shaking him "excessively and aggressively with force." Because three people were caring for the child when the injuries occurred, the mother included, a child protective assessment was founded against an unknown perpetrator. The mother agreed to a safety plan with the Iowa Department of Health and Human Services and moved in with her great-grandparents, who supervised her contact with J.T.

---

[1] J.T. has a different father than E.C. All references to the father are to E.C.'s father.

The department eventually determined that the mother's contact with J.T., who was doing well, no longer needed to be supervised. Soon after, in October 2019, the mother found J.T. unresponsive, "blue and not breathing," in his pack and play. He was rushed to the hospital where it was determined that he sustained severe trauma to his brain. J.T.'s medical team found these were new injuries and much more serious than before, though they were once again caused by "being shook repetitively over and over again and/or with she[e]r force." A department caseworker testified that J.T. will likely "never walk, talk, have voluntary movement on his own, eat on his own. He will be permanently blind, and he does not have the ability to maintain his own body temperature on his own."

A criminal investigation into J.T.'s injuries discovered that in the days before the mother found the infant unresponsive, she deleted the web searches on her phone. But law enforcement was able to recover the following Google searches from her phone: "symptoms of blindness in babies," "what does it mean if there is a film on my baby's eyes," "can spinal stenosis happen from trauma," "can you go paralyzed from being squeezed in the neck," "my baby's pupils are big," "my baby stopped breathing while sleeping," "I'm not bonding with my baby," and "reasons for low temp and babies."

The mother was found to be responsible for the injuries to J.T. on both occasions.[2] Criminal charges were filed against her for child endangerment resulting in serious injury. Those charges were still pending when E.C. was born in October 2020. As for E.C.'s father, he was possibly affiliated with a gang and

___

[2] J.T. was adjudicated a child in need of assistance, reasonable efforts for the mother were waived in July 2020, and her rights were terminated in May 2021.

incarcerated on a charge of terrorism at the time of her birth. Because of these concerns, coupled with the department's belief that the mother would flee the state with E.C., the State obtained an order for E.C.'s temporary removal the day after she was born, which was confirmed following a formal hearing in November. In December, the child was adjudicated as in need of assistance.

As the case progressed, the department acknowledged that "[i]n terms of services, [the mother] has done everything that she has been asked or court ordered to do," and more, including mental-health therapy, anger management, and parenting education. And her visits with E.C. went "extremely well." But, as the caseworker pointed out, "there is one significant thing that she has failed to do. She has failed to take responsibility for her son's injuries," which "makes it difficult for the department to determine if [she] could safely parent [E.C]." Rather than taking responsibility, the mother provided varying explanations about why J.T.'s injuries were accidental. All of those explanations were ruled out by medical professionals, who determined that the injuries were non-accidental.

In July 2021, the State petitioned to terminate both parents' parental rights. At the time of the termination hearing in November, the father was in prison with no prospect for release in the foreseeable future. Because he had been incarcerated since before E.C. was born, he had very little contact with her. As for the mother, the department continued to have serious concerns about her ability to safely parent the young child, so she never progressed beyond fully supervised visits. In her testimony, the caseworker explained:

> Our concern is that she's not taken accountability for those injuries [to J.T]. So the concern is that the services that she has

> participated in have not really been effective at addressing the abuse that occurred.
>
> And despite some of those services, she's also continued to struggle. Throughout the course of this case, she's struggled with substance abuse, and I think she struggles at times to regulate her emotions.

When asked why the child could not be returned to the mother's care, the worker said,

> I believe she's unsafe. I believe the adjudicatory harm has not been alleviated. There's still a significant likelihood that she could be physically abused by [the mother], based on the fact that I don't think services have effectively addressed the reason for the abuse because she hasn't taken accountability.

In her testimony, the mother stated, "I don't have any answers" when asked about the cause of J.T.'s injuries. While the mother said that she took "full accountability" for his injuries, she still asserted they were accidental. She also testified that the opinions of medical professionals about the causes of the injuries, and the searches recovered from her phone, were "not accurate." The mother was set to go to trial on the charges stemming from J.T.'s injuries in January 2022, although she believed the trial would be continued.

In its ruling,[3] the juvenile court terminated the mother's parental rights under Iowa Code section 232.116(1)(g) and (h) (2021) and the father's rights under section 232.116(1)(e) and (h). Both parents appeal.

## II.    Analysis

Our review of termination proceedings is de novo. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). An order terminating parental rights will be upheld if there

---

[3] While the termination hearing took place in November 2021, the court did not file its ruling until August 2022, shortly after the department moved to suspend the mother's visits due to her negative and violent behaviors.

is clear and convincing evidence of the statutory grounds for termination. *Id.* We use a three-step analysis to review the termination of a parent's rights, which begins with whether the grounds for termination have been established. *See id.*; *see also* Iowa Code § 232.116(1)–(3). The paramount concern is the child's best interests. *L.B.*, 970 N.W.2d at 313.

The parents purport to challenge just the first step in the analysis,[4] with each claiming the evidence was not sufficient under the grounds used to terminate their parental rights. Focusing on Iowa Code section 232.116(1)(h), which the court relied on in terminating both parents' rights, *see In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (noting the appellate court may affirm termination "on any ground we find supported by clear and convincing evidence"), the mother argues the child could have been returned to her "care if given an additional six months to reunify." The father likewise submits the child could have been returned *to the mother* if she was allowed additional time.

The snag in their arguments is that the State only had to prove the child could not be returned to parental custody at the time of the termination hearing. *See* Iowa Code § 232.116(1)(h)(4) (requiring "clear and convincing evidence that

---

[4] We note that in her challenge to termination under section 232.116(1)(g), the mother passively suggests: "It was not in the child's best interests for her mother's rights to be terminated." Similarly, in her challenge to termination under paragraph (h), the mother submits: "Reasonable efforts were never made to place the child with her mother." But because the mother does not supply freestanding substantive arguments on these issues, we consider them waived. *See In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000) ("A broad, all encompassing argument is insufficient to identify error in cases of de novo review."); *L.N.S. v. S.W.S.*, 854 N.W.2d 699, 703 (Iowa Ct. App. 2013) ("Where a party has failed to present any substantive analysis or argument on an issue, the issue has been waived."); *see also* Iowa R. App. P. 6.903(2)(g)(3).

the child cannot be returned to the custody of the child's parents . . . at the present time"); *D.W.*, 791 N.W.2d at 707 (interpreting the statutory language "at the present time" to mean "at the time of the termination hearing"). Based on the parents' agreement that the child could not be returned to them at that time, we affirm termination under section 232.116(1)(h) as to both parents. *See, e.g.*, *In re Z.R.*, No. 21-1290, 2022 WL 1487119, at *2 (Iowa Ct. App. May 11, 2022) ("The mother's concession amounts to clear and convincing evidence that the child could not be returned to her care at the time of the termination hearing." (cleaned up)). We also observe, as to the father, that he lacks standing to challenge termination of his rights based on an argument belonging to the mother. *See In re S.O.*, 967 N.W.2d 198, 206 (Iowa Ct. App. 2021) ("[O]*ne parent* cannot assert facts or legal positions pertaining to the *other parent* because the juvenile court makes a separate adjudication as to each parent.").

In her final brief point, the mother highlights the exception to termination when a relative has legal custody of the child—a point the father echoes. *See* Iowa Code § 232.116(3)(a). But both acknowledge that exception does not actually apply since E.C. was not in a relative's care; they just wished that she was. The mother then repeats her argument that "the court could have and should have granted additional time for [her] to work toward reunification with her child which she requested."

We reject this argument because the mother "has not enumerated what factors, conditions, or expected behavioral changes will alleviate the need for removal at the end of an extension." *In re L.S.*, No. 21-2000, 2022 WL 2826024, at *1 (Iowa Ct. App. July 20, 2022). And she agreed in her testimony that another

six months would not "affect a change of this situation." The mother also still has pending criminal charges, with the possibility of receiving a term of confinement following trial on those charges. *Cf. id.* ("We don't even know if he will be out of jail or prison by then. So we have no basis to conclude an extension of time is warranted.").

Finally, because the mother has refused to take responsibility for the injuries to her other child, the department has been unable to assess whether her participation in services has addressed the issues leading to that child's abuse. Based on the mother's ongoing refusal to accept responsibility, that circumstance is unlikely to change in six months. *See In re N.F.*, 579 N.W.2d 338, 341 (Iowa Ct. App. 1998) ("[A] good prediction of the future conduct of a parent is to look at the past conduct."). This is especially so considering the mother's psychological evaluation, which noted that she would need "prolonged psychotherapy" to acknowledge the abuse "and begin to understand the psychological forces that led her to engage in" such behavior.

The father also requests more time, but his tentative discharge date is not until 2027, well beyond the six-month extension period. To the extent that he is requesting more time for the mother, he has no standing to do so. *See S.O.*, 967 N.W.2d at 206.

For these reasons, we affirm the termination of both parents' rights and deny their requests for additional time.

**AFFIRMED ON BOTH APPEALS.**